**STATE of Missouri, Respondent,**

v.

**Terrell F. REYNOLDS, a/k/a Terry Reynolds, Appellant.**

**No. WD 37952.**

Missouri Court of Appeals,
Western District.

Oct. 28, 1986.

Motion for Rehearing and/or Transfer to Supreme Court Denied Dec. 23, 1986.

Application to Transfer Denied
Feb. 17, 1987.

Jerold L. Drake, Grant City, for appellant; Stephens and Drake, of counsel.

David A. Baird, Pros. Atty., Nodaway County Courthouse, Maryville, for respondent.

Before BERREY, P.J., and PRITCHARD and DIXON, JJ.

PRITCHARD, Judge.

In a first amended information appellant was charged with the commission of the crimes (1) promoting gambling in the second degree in violation of § 572.040, RSMo. (eff. Jan. 1, 1979); (2) gambling in violation of § 572.020.1; and (3) resisting arrest in violation of § 575.150. By the verdict of a jury, appellant was acquitted of the gambling charge, but was found guilty of promoting gambling and resisting arrest. On each of the guilty verdicts the court sentenced appellant to $500 fines and to jail sentences of 30 days, to run concurrently, but execution of the jail sentences was suspended and he was placed on probation for two years under the supervision of the Missouri Department of Probation and Parole.

Appellant operates a restaurant in Maryville, Missouri, catering to daytime trade, known as Terry's House of Heartburn. On April 15, 1985, after the restaurant had closed and its front door was locked, six city police officers arrived at its rear door, which was unlocked or ajar, to execute a search warrant. Officer Smail then heard a male voice say, "Come on, five. Got to have a five," but he could not identify the voice. The officers went on into the restaurant where a total of nine persons were present—three employees in the front, and six persons in the rear storage area where appellant was seated at a table drinking a cup of coffee. Smail testified that on entering the restaurant he saw a large amount of money on the table, but when he looked back there was only a five dollar bill on it, and the individuals had money in their hands. Besides appellant, only Rick Holaday and perhaps Gayle Harmon were seated at the table. The others, except Terry Allen, were standing close to it where they could touch it. Smail found a set of dice in Harlan Dredge's pocket, and

another set in a table drawer. Smail told the officers to collect any loose money that the men had in their pockets.

The storage room table was covered by a cloth, and on it was a "U" shaped wooden piece described as a back board, which appellant testified was a "tater bin" which was used to prevent potatoes from rolling off the slanted table as they were being peeled. Officer Smail did not see any dice being rolled, any bet being placed or any money changing hands.

Section 572.040 provides: "A person commits the crime of promoting gambling in the second degree if he knowingly advances or profits from unlawful gambling or lottery activity." The state here concedes that the evidence does not show that appellant profited from gambling, but contends that he "knowingly advanced" unlawful gambling.

Section 572.010 has this definition: "[A] person 'advances gambling activity' if, acting other than as a player, he engages in conduct that materially aids any form of gambling activity. Conduct of this nature includes but is not limited to conduct directed toward the creation or establishment of the particular game, lottery, contest, scheme, device or activity involved, toward the acquisition or maintenance of premises, paraphenalia, equipment or apparatus therefor, toward the solicitation or inducement of persons to participate therein, toward the actual conduct of the playing phases thereof, toward the arrangement or communication of any of its financial or recording phases, or toward any other phase of its operation. A person advances gambling activity if, having substantial proprietary control or other authoritative control over premises being used with his knowledge for purposes of gambling activity, he permits that activity to occur or continue or makes no effort to prevent its ocurrence or continuation."

Appellant first contends that as a matter of law he did not advance gambling on April 5, 1985, because there was no evidence of gambling activity on the Heart-

burn premises, which is a requirement for the crime of promoting gambling under § 572.040, *supra.* Appellant seeks to bolster the contention by arguing that he was acquitted of gambling; five witnesses testified that there was no gambling on that day; and the police officers did not observe any gambling on that date. The contention and argument ignores the circumstantial evidence presented by Officer Smail that he heard from outside a voice say "Come on, five. Got to have a five" [an expression commonly known, as the jury could find, to implore dice to roll a previous number]' Smail saw a large amount of money on the table, but when he looked back only a five dollar bill was on it, and the individuals standing close to the table then had money in their hands; and Smail found a set of dice in Dredge's pocket. There was also a table covered with a cloth, and a backboard, which the jury could also find was a device for stopping the roll of dice.

The jury was given Instruction No. 11, which followed the definition of "advancing gambling activity" contained in § 572.010, *supra,* the first of which is the engaging in conduct that materially aids any form of gambling activity. That conduct, as the jury could find, was the creation or establishment of the game, device, the maintenance of premises, the paraphernalia and equipment (the table, cloth, and backboard), and the inducement of persons present to play the game. Indeed, although the jury did not convict appellant of gambling (he was just sitting at the table drinking coffee), certainly it could have found that activity was going on, and it was entitled to consider testimony that gambling had been going on on previous occasions. Employee, Julia Partridge, testified that she had seen persons shoot craps before that day, sometimes on a regular occurrence, and it would not be unusual for there to be a crap game going on, or for it to take place where the table was located. The state points out that it is not an element of the offense of advancing gambling that gambling actually be going on. That is correct, considering the first definition of the statute as to conduct which materially aids gambling activity. Appellant's ownership, operation and control over the Heartburn premises was fully proved, so as to accord with the last sentence of § 572.010, *supra.*

It is said at page 54 of Vol. 41A V.A. M.S., Comment, that the definition of "advance gambling activity" is taken from Michigan Revised Code § 1601(a) Final Draft 1967. Research has shown that the Michigan Legislature has never adopted this draft, so there are no precedents from that state as to the issue here. Other states have similar statutes, however. In *State v. Hiller*, 22 Or.App. 57, 537 P.2d 571, 573 (1975), ORS 167.117(9) is quite similar to § 572.010, and defendants conviction thereunder for promoting gambling was affirmed where he, as manager of the premises, had the right of control thereof, and permitted dice games to occur thereon. *See also State v. Cooper*, 78 Or.App. 237, 715 P.2d 504 (1986), where a complaint was held insufficient for failure to state specific facts to allege knowingly promoting unlawful gambling. In *Chimelewski v. State*, 681 S.W.2d 166, 169 [5] (Tex.App.1984) defendant's conviction of promoting gambling was affirmed on circumstantial evidence there listed.

Appellant next says that the alleged game, even if it had occurred, was a social game and not of the type made criminal by §§ 572.010 and 572.040, which prohibit exploitive gambling only. Appellant was not convicted of gambling. Rather, he was convicted of promoting gambling by advancing gambling activity, which is an entirely different and separate offense than a gambling offense proscribed by § 572.020. It was for the jury to determine under all the facts if appellant's acts were sufficient to constitute material aid to any form of gambling activity, and whether the game or games conducted on the premises were of a private, social nature. It is said in the comment to § 572.010 that one of two kinds of exploitive gambling is "advancing" unlawful gambling activity, which is certainly the case under the facts here.

■ Finally, appellant says that one does not advance gambling activity merely by being a "player". The evidence here shows that appellant rendered material assistance to the establishment, conduct or operation of the particular gambling activity beyond being a mere player as that term is defined in § 572.010(8). He cites *State v. Fredrickson*, 689 S.W.2d 58 (Mo.App.1984) for his proposition that if he was a "player" (only) he could not be convicted of promoting gambling. Appellant errs in saying that he was charged with being a player. He was charged with committing gambling under § 572.020.1, and acquitted thereof. These are separate offenses, not mutually exclusive. *State v. Fredrickson* involved simultaneous convictions for prostitution *and* promoting prostitution occurring in the *same* transaction, held to be therefore mutually exclusive, for one could not be charged for promoting her own prostitution. The contention is without merit.

It is ruled that the state made a prima facie case that appellant promoted gambling by advancing gambling activity as defined in the statute, and the trial court did not err in submitting the issue to the jury. That, however, does not end the matter. During the trial Larry Wayne Jackson, Maryville's director of Public Safety testified that prior to the issuance of a search warrant of the Heartburn restaurant, he received two telephone calls from unidentified females in reference to gambling that was going on at the restaurant. The first caller asked him why he wasn't doing something about it, and proceeded to tell him that there were dice games going on there and large amounts of money were being lost and transacted at the time, and that her husband had participated in games there and had lost large amounts of money, "and that if the Public Safety Department didn't do something about it, then she was going to call the Attorney General's office to see if she could get some help." In a matter of minutes, the second phone call was received by Jackson in which the woman told him that her husband had also participated in gambling games at Terry's House of Heartburn and that her husband had lost full payroll checks in gambling games that were going on there, and she wanted to know why he had not done something about these.

Appellant objected to both telephone calls on the ground of hearsay and that he had no opportunity and would get no opportunity to cross-examine the individuals, and that it was prejudicial and irrelevant. The court overruled the objections stating that it would instruct the jury that the phone call(s) did not prove the truthfulness of what may have happened, but only to explain what the witness subsequently did; that he acted upon that. Instruction No. 13 was given on that subject.

■ In *State v. Kirkland*, 471 S.W.2d 191 (Mo.1971) Jones, a police officer was allowed to testify that a Mrs. Mayo had told him that a Pamela Reynolds and defendant had gotten into a cab, the driver of which was later allegedly robbed by defendant, Pamela being then present. This led the officer to go to Pamela's house where he found defendant and arrested him. Defendant and Pamela were taken to the police station where the cab driver identified both of them. The contested issue in the case was the identification of defendant as one of the robbers. The court held that the admission of the hearsay testimony of Officer Jones was prejudicial error in that it went directly to the issue of identification and consequently to the issue of guilt, and that neither the *fact* that Mrs. Mayo made the statement to Jones, nor whether he was justified in relying on it, was material or relevant to any issue before the jury. So also in this case. The two anonymous telephone calls to Jackson were clearly hearsay. Those calls tended to establish the *truth* of whether gambling activity was going on at Terry's House of Heartburn by evidence which was incompetent, neither caller being subject to cross-examination. Although information coming to Jackson from the telephone calls may have been material to the issuance of the search warrant on probable cause, it had no place in the trial of the case on the issue of appellant's guilt of advancing gambling activity.

Two cases cited by the state are distinguishable on the matter of the exceptions to the hearsay rule on extra judicial statements. In *State v. Houston*, 607 S.W.2d 183 (Mo.App.1980), the hearsay testimony came out on redirect examination by the state after cross-examination by the defense tending to show no cause to arrest defendant. The court held merely that the redirect examination was proper in order to refute or remove inferences resulting from cross-examination, as an exception to the hearsay rule. In *State v. McIntosh*, 635 S.W.2d 370 (Mo.App.1982), a pharmacist, in response to a telephone call for a prescription, checked as to a given physician's address, phone number, and DEA number, and finding none, called the police. Under those facts, it was held that the phone call to the pharmacist, *the victim*, was properly admitted, as fact representations of the call from a physician's office asking for a Tylenol prescription and giving his address, phone number and federal DEA number, which were the basis for the pharmacist's subsequent actions in checking the information and then calling the police. In this case there was no victim, and thus the *Houston* and *McIntosh* cases are not in point. Because of the improper admission of the hearsay evidence of telephone calls, the judgment of conviction for promoting gambling must be reversed, and that charge remanded for new trial.

As to the charge of resisting arrest, the evidence is this: after the officers had entered the storeroom, the individuals who had money in their hands started putting it in their pockets. Officer Smail told the officers to collect the money in the pockets, and when they began doing that an encounter with appellant occurred. He began arguing with the officer over whether he was going to get a receipt at the time. Officer Crow went to talk to appellant who became boisterous and belligerent. According to Smail, appellant pulled away from Crow. There was some profanity and a scuffle started, but Smail could not see it too well. He hollered at Crow and told him, "Go ahead and cuff him, take him down to the station. We'll get his property there."

Officer Crow first went to the front door of the restaurant, and finding it locked, admitted another officer standing outside it. Crow tried to explain to appellant to let them go ahead and do their job, but he again became boisterous and would not comply. It had been prearranged that if there was a problem it would be alleviated by placing the subject under arrest and transporting him. Crow attempted to do that. Appellant drew his arm back after Crow had grabbed hold of it and told him to place his hands on the wall, at which point he yanked away from Crow. "During that course his hand struck me across the face. Whether it was in a manner he meant to do that, I don't know. I received a small cut under my eye." Crow then held one of appellant's arms, and assisted by two other officers he was placed in handcuffs "as by procedure" and transported down to Public Safety. On cross-examination it was developed that after Crow had appellant by the arm, another officer held him by the throat, and he was held against the wall until they were able to handcuff him behind his back.

Section 575.150.1 provides, "A person commits the crime of resisting or interfering with arrest if, knowing that a law enforcement officer is making an arrest, for the purpose of preventing the officer from effecting the arrest, he: (1) resists the arrest of himself by using or threatening the use of violence or physical force as * * *."

■ Giving to the state the benefit of the evidence in its light most favorable to it, as this court must do, *State v. Powell*, 630 S.W.2d 168 (Mo.App.1982), there was sufficient evidence for the jury to find, as it did, that the acts of appellant amounted to resistance of Officer Crow. As Crow was attempting the arrest, appellant drew his arm back after Crow had hold of it, and upon being told to place his hands on the wall he yanked his away and then Crow was struck across the face. This is a sufficient amount of physical force under the statute to constitute resisting arrest. There is no evidence that the officers were

using unreasonable force, but even if such evidence were present, that would not void the arrest, *State v. Hernandez,* 651 S.W.2d 187, 190 (Mo.App.1983). Under the statute, appellant had the duty to submit to the arrest.

The judgment of promoting gambling in the second degree is reversed and the case is remanded for new trial upon that charge. The judgment of resisting arrest is affirmed.

All concur.